ELECTROPURE SALES CORPORATION, a corporation of the State of Delaware,

*vs.*

FOREMOST DAIRIES, INC., a corporation of the State of Delaware.

*New Castle, April 28, 1943.*

William Prickett, for complainant.

Charles F. Richards, of the firm of Richards, Layton & Finger, and Louis Kurz, of the firm of Ragland, Kurz & Layton, of Jacksonville, Fla., for defendant.

PEARSON, Vice-Chancellor: At all times with which we are concerned, complainant manufactured and sold patented devices for the purification or pasteurization of milk by a process which involves the passage of an electric current through the milk. Defendant operated dairies and creameries in various cities in the southern states. Dairy products sold by defendant include milk, cream, buttermilk, chocolate malted milk, "orangeade", butter, cottage cheese and ice cream. Complainant installed one of its "electropure" processing devices in each of defendant's dairies in Jacksonville, Florida; Atlanta, Georgia; and Birmingham, Alabama; and the parties entered into separate contracts with relation to these three installations. In each agreement, defendant undertook to pay a royalty for the use of the apparatus. This suit was brought to require an accounting for the royalty payable under the contracts. At the hearing, defendant conceded that it should account, but it is at odds with complainant as to the basis for the computation of the royalty. Both sides presented forms of an interlocutory decree. Defendant contends that the proper royalty basis is the quantity of fluid milk (alone and as distinguished from products containing or derived from milk) processed at its Jacksonville plant, and that processed at, and sold at, its Atlanta and Birmingham plants. It asks that the interlocutory decree limit the accounting to the basis thus defined. Complainant insists that the decree should direct defendant to account for all products processed, and

that the amount of royalty payable should be determined by the milk content of the products processed. This point of difference is the sole matter now to be determined.

Defendant argues that the scope of the accounting to be ordered should in no event be broader than the provisions of the agreements between the parties require. This is patently correct, for complainant's asserted rights to an accounting rest ultimately upon the provisions of the agreements. Indeed, in the bill, complainant alleges that the accounting to which it is entitled "requires the calculation of royalties due under said agreements in strict accordance with all the provisions thereof"; and in the prayers, complainant asks in this connection only that defendant be directed to account "for the full amount of royalties due complainant under said agreements in accordance with the provisions of said agreements."

The Jacksonville contract was the first between the parties, and was undertaken in 1932. It provides for the installation by complainant of specified machinery (a unit processing apparatus), in defendant's Jacksonville plant. It provides that defendant shall have the exclusive use of the "electropure" process "for the treatment of milk, cream, and other dairy products" in the territory of Jacksonville and Duval County, Florida, provided that defendant "operates the said apparatus in the treatment of milk, cream and other dairy products and makes payments" and performs conditions as specified in the contract. Defendant agreed as a part of the consideration "to confine the use of said apparatus only to the treatment of milk, cream, and other dairy products as may be sold in said territory". After providing for the payment of a fixed sum, in consideration for complainant's undertakings, the contract reads in part thus (substituting the terms "complainant" and "defendant" for the contract designations of the parties, respectively) :

"And in addition to the above payments," defendant "agrees to pay a royalty on all of the milk, cream and other

dairy products processed, the amount of such royalty to be a sum equal to one cent per hundred pounds of milk electro-purified for the preceding month, said royalty to be paid to" complainant "on the 10th day of every month." Defendant "agrees to furnish to" complainant "a true and correct account of milk processed each month on a form furnished to" defendant by complainant.  * * * "It is also understood and agreed that" defendant "shall have the option at any time during and while this agreement is in effect to pay in advance and in lieu of all other royalties thereafter accruing for the use of said equipment and process, a sum equal to five cents per hundred pounds of milk processed by" defendant "at said plant during the preceding twelve months of operations, and upon such payment," defendant "shall have the right to use said equipment and process at its said plant without the payment of any sum by way of royalty to" complainant.

Immediately following the signatures of the parties, there is a writing which purports to be a grant by complainant to defendant of a license to use and operate the appliances embodying the improvements described in certain patents then or thereafter issued "for the purpose only of treating milk and cream, ice cream and chocolate milk." The patents and applications mentioned are the same as those referred to in the agreement, as covering complainant's apparatus for the purification of milk.  The "license" is not limited as to place for the use and operation of the appliances; but provides, as conditions, that the terms of the agreement be fully and completely carried out on the part of defendant, and that "in the event of the non-fulfill- ment of the said terms and conditions of the said agreement, then this License to be held for naught and of no effect."

Defendant would construe the agreement as conferring the right to process "milk, cream and other dairy products", and as fixing the monetary price of this right as a royalty "on" milk, processed alone (in addition to the lump sum

payment). But the agreement expressly designates what the royalty shall be "on": it is "a royalty on all of the milk, cream and other dairy products processed",—not on milk, processed alone. The "amount" of the royalty is determined by the quantity of "milk electropurified". The formula prescribed is capable of application in the case of any dairy products processed. The natural meaning suggested by the language is that the royalty would be payable on milk processed, whether it were allowed to remain as milk, or further treated and converted into some other dairy product. If the dairy product actually passing through the apparatus should consist of a derivative of milk, or a mixture of milk and other substances, the royalty base would be the volume of the milk content. If the product processed should consist of a component part of milk, separated by mechanical or other means, such as cream, the base would seem reasonably to be the milk component itself. Defendant argues to the contrary on the ground that in other parts of the agreement, the words "milk" and "cream" are used to indicate separate products. The possible constructions in this connection are either that a royalty is payable, or is not payable, on cream or other dairy products processed, consisting of milk components. The explicit language fixing the royalty "on all of the milk, cream and other dairy products processed" directs the interpretational choice: that the word "milk", as used in defining the method of computation of the amount of the royalty, indicates whole milk as well as milk components.

The "license" which follows the agreement does not appear significant from the standpoint of construing the agreement's provisions establishing the royalty base. Although the "license" purports to authorize the use of the apparatus only for the treatment of "milk and cream, ice cream and chocolate milk", the terms of the agreement are different in granting the "exclusive use" of the process "for the treatment of milk, cream, and other dairy products" in

Jacksonville and Duval County Florida. Whatever effect the "license" may have, it does not furnish cause for restricting the scope of the more comprehensive terms of the agreement.

The royalty provisions in the Atlanta agreement (1934) are substantially the same as in the Birmingham agreement (1935), and hence, these may be considered together. Each agreement grants to defendant the exclusive use of the "electropure" apparatus installed in defendant's respective plants "for the treatment of milk and cream". In each, defendant agreed to confine the use of the apparatus "to the treatment of milk and cream as may be sold in" territory defined. Defendant further agreed to pay complainant "for the use of" the apparatus "for the treatment of milk and cream" a fixed sum, in installments,

"And in addition to the above payments" defendant "agrees to pay a royalty on all of the milk and cream processed and sold. A royalty of one cent (1c) per hundred weight. Said royalty to be paid to" complainant "on the 10th of each month, for milk and cream electropurified and sold for the preceding month, and" defendant "agrees to furnish to" complainant "a true and correct account of milk and cream processed and sold each month on a form furnished" defendant by complainant.

"It is further understood by the parties hereto that" defendant "has the option at any time during the life of this contract to discount the above royalty by paying five cents (5c) per hundred weight cash in advance on all milk and cream electropurified and sold during the preceding twelve (12) months."

In the briefs, defendant takes the position that these two agreements, properly construed, reserved a royalty only on milk and cream, processed and sold as such, excluding all other dairy products. Clearly, it would require a forced and irrational construction of the language to discriminate, for the purpose of computing royalties, between milk or cream processed and sold as such, and milk or cream processed and later sold after having been converted into some other product. As to such products, as well as derivatives

of, and mixtures containing, milk or cream, it seems to me that defendant's position at the hearing amounted to an admission that the royalty provisions should be construed as applicable to all of them; in other words, that the royalty basis, fixed by the contracts, is the quantity of milk or cream processed and sold, including derivatives and mixtures to the extent of the milk or cream content. In the early part of the hearing, Mr. Kurz, for defendant, made a statement of the defendant's position. He asserted the contention that the Jacksonville contract "specifically provided for a royalty on milk only". After mentioning an installation at Spartanburg, S. C., with which we are not now concerned, he continued:

"We expect also to show that there was no agreement whatsoever in writing, no written contract, with regard to the installation of Birmingham, Alabama; although it was the understanding that we had in connection with it, that the usual royalty would be charged which was customarily charged by the Electropure Company on installations of that kind, and *that the royalty was to be on the products which were processed through the apparatus.*"[1]

Later, referring to the Atlanta contract he said:

"The second contract fixes the royalty on the milk and cream processed and sold. We contend that only milk was processed under the second contract, that it pertains only to that."

With reference to all of the contracts, defendant's solicitors repeatedly asserted that the primary issue was on what products should royalties be paid. In explaining a statement to the effect that the court should determine "under the contract" what products were the subject of the accounting, Mr. Kurz said:

"No. Of course your Honor must determine, must construe the contract legally, but must also decide on the facts. That is, of course, it is a fact whether or not the defendant processed these other products. Either they did or they did not. *If they did, they ought to account for royalties on those products.* If they didn't they should not account

---

[1] Italics in this and the following quotations have been supplied.

for royalties on those products. We ask your Honor to determine that after hearing the evidence this morning."

In connection with defendant's offer of certain depositions relating to the Atlanta installation, Mr. Kurz made the following remarks:

"The whole thing we are concerned with now, is whether we should account for anything except milk. *I certainly agree that if chocolate milk was processed we should pay a royalty.* Our contention is, however, that nothing but sweet milk went through the process, and that is the meaning of these depositions. * * *"

I find no merit in defendant's present contention that these direct and unambiguous statements do not constitute admissions binding upon it, with respect to the construction of the Atlanta and Birmingham contracts. Compare: 2 *Jones Commentaries on Evidence,* § 956.

However, as to all of the installations defendant contends, and adduced evidence to prove, that it used the "electropure" processing devices only for the treatment of milk; and that, therefore, the basis of the accounting for royalty should be limited in the decree to fluid milk, even assuming that the royalty provisions of the agreements comprehend other dairy products. Certain of defendant's evidence indicates that steam vats were used for the pasteurization of all of its products, except sweet milk. Prior to the hearing, defendant did not by its answer to the bill raise an issue whether milk was the only product processed by it. In the answer, defendant admitted the use of the apparatus installed at Jacksonville, Atlanta, and Birmingham, and set up various defenses to the claim for royalty on "dairy products" processed by it. These defenses include waiver, laches, acquiescence, failure of complainant to perform its agreements, and an understanding between the parties that no royalty should be paid. Defendant averred that it was not indebted to complainant "in any amount whatsoever, by way of royalty or otherwise." Defendant's solicitor stated at the hearing that the question, which products were pro-

cessed, was in issue; but complainant's solicitor expressly declined to treat it as an issue and insisted that in the existing state of the pleadings there was no occasion for complainant to prove all of the kinds of products which defendant has processed. During the course of the hearing, complainant amended its bill with respect to the Birmingham installation. At the conclusion of the hearing, defendant filed an answer to the amendment of the bill, and then, for the first time, put in issue the matter of the kinds of products processed, but only with relation to the apparatus installed in the Birmingham dairy. In the amended answer, defendant "admits that the said unit was used by it in its Birmingham dairy for the treatment of milk but denies that it was used for the treatment of any other dairy product." In the case of the other contracts, defendant's position in its original answer was unchanged, and complainant had the burden of meeting only the issues raised by the bill and answer. Since these have been met, complainant has established its right to an accounting and the decree should direct an accounting with respect to the quantity of all products specified as the royalty base in the Jacksonville and Atlanta contracts, respectively, as hereinbefore construed.

As to the Birmingham agreement, it does not appear that defendant treated in the apparatus any product other than milk. The amended answer imposed upon complainant the burden of showing that other products were processed, and this it has failed to do. But neither the amended answer nor the proofs relieve defendant from the duty to account with respect to milk processed in complainant's device, whether sold as such, or after subsequent conversion into some other product. Consequently, the decree should direct an accounting for royalties under the Birmingham contract on milk processed in the apparatus and thereafter sold in any form.

A decree accordingly will be advised.